IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CALIFORNIA COAST UNIVERSITY, )
                              )
            Plaintiff         )
        vs                    )      16cv158
                              )
JAIME SUE ALECKNA,            )
                              )
            Defendants        )
_____  )

TRANSCRIPT OF PROCEEDINGS
ORAL ARGUMENT
BEFORE THE HONORABLE ROBERT D. MARIANI
TUESDAY, AUGUST 20, 2019; 11:00 A.M.
SCRANTON, PENNSYLVANIA

FOR THE PLAINTIFF:
    Daar & Newman
    By: Jeffery J. Daar, Esq.
    21700 Oxnard Street, Suite 350
    Woodland Hills, California 91367

-AND-
    Sheils Law Associates, P.C.
    By: Robert P. Sheils, III, Esq.
    108 North Abington Road
    Clarks Summit, Pennsylvania 18411

FOR THE DEFENDANT:
    Sabatini & Freeman, LLC
    By: Carlo Sabatini, Esq.
        Brett M. Freeman, Esq.
    216 N. Blakely Street
    Dunmore, Pennsylvania 18512


    Proceedings recorded by machine shorthand, transcript
produced by computer-aided transcription.
_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA  18503

1    THE COURT: Good morning, everyone. Would counsel enter

2 their appearances, please, beginning with Plaintiff.

3    MR. DAAR: Sure. Jeffery Daar from Daar & Newman on behalf

4 of the Appellant California Coast University. Good morning.

5    THE COURT: Good morning.

6    MR. SHEILS III: Robert Sheils on behalf of the Appellant.

7    MR. SABATINI: Carlo Sabatini and Brett Freeman on behalf of

8 the Appellee.

9    THE COURT: All right, this is the matter of California

10 Coast University v. Jaime Sue Aleckna. Before me is an appeal

11 from the Order of the Bankruptcy Court, the Honorable Robert

12 Opel, finding that California Coast violated the Automatic Stay

13 Provisions of 362(k) and awarding damages, including attorney's

14 fees.

15    There's been an appropriate appeal timely filed by

16 California Coast. And counsel, I want you to know that I've

17 read everything you've given me, all of your submissions, so I

18 consider myself reasonably familiar, based on my readings, with

19 the issues in the case.

20    I'd like to make a few opening comments, and I'll ask you,

21 in particular, once I frame the issues, to address those issues

22 for me.

23    By way of background, my understanding is that Ms. Aleckna

24 was a student at California Coast University, which is a

25 distance learning school in Southern California, that she

1  completed her last coursework as a student in September of

2  2009, that she failed to make tuition payments to California

3  Coast University involving her education starting in or about

4  2008. California Coast placed a financial hold on her account

5  but did not pursue any collection efforts against her.

6      Then, on June 1, 2012, it's my understanding that Aleckna

7  and her husband filed a Chapter 13 bankruptcy case and received

8  the automatic stay, pursuant to Section 362 of the Bankruptcy

9  Code. Likewise, I understand that Aleckna listed California

10 Coast as an unsecured creditor with a disputed claim in the

11 amount of $6300 in her bankruptcy schedules.

12     The debt was disputed because Aleckna was not sure if the

13 debt was a student loan or otherwise dischargeable under the

14 Bankruptcy Code.

15     Likewise, I understand that on July 6, 2012, Aleckna

16 telephoned California Coast University's general line to

17 request a copy of her official academic transcript. This, of

18 course, was after her June 1, 2012 bankruptcy filing. She was

19 connected to someone named Angela Cenina in the Registrar's

20 Office who informed her that California Coast's policy

21 regarding transcripts was or, at least, included a financial

22 hold on her transcript because, first of all, the school had no

23 record of her bankruptcy, and that a request for an official

24 transcript must be submitted in writing by the student on an

25 official transcript form, and, of course, the hold was the

1  result of the $6300 debt at that time.

2      Thereafter, Ms. Aleckna did, by Certified Mail, request

3  three copies of her transcript. In response, California Coast

4  sent an email to Ms. Aleckna requesting a copy of her

5  bankruptcy discharge papers, as well as a copy of an official

6  document showing that California Coast University had been

7  listed as a debt on her bankruptcy schedules.

8      Thereafter, counsel for Aleckna provided California Coast

9  on July 18, 2012 with a copy of Aleckna's Bankruptcy Petition

10 and Schedules and requested the release of the transcripts. The

11 transcripts were mailed by California Coast on July 27, 2012 to

12 Aleckna, three copies having been so sent.

13     The transcripts, however, did not list any date for

14 Aleckna's graduation. At that time, on August 7 of 2012,

15 Aleckna, at her trial, testified that she telephoned California

16 Coast and asked why a graduation date was missing from her

17 transcript. She testified she was told that she, quote, did not

18 technically graduate, end quote, because of the financial hold

19 on her account from years before.

20     Those are the basic facts. I'll invite counsel, of course,

21 to add to that, as you see fit, or to correct me if you think

22 I've misstated what are the essential facts in the case.

23     Now, I think there are, essentially, three major issues in

24 this case, and there are some subsidiary issues, and by no

25 means am I precluding anyone from arguing what they want to

1  argue, but I would like to identify what I think those three

2  issues are for you, and then I'll hear argument on those

3  matters.

4       To me, as I read the submissions here, the first issue is,

5  What is the standard for determining willfulness? Is it the

6  standard that's set forth in Atlantic and then in University

7  Medical Center, pursuant to which a violation of the automatic

8  stay will not be deemed willful, if, as the Court said in

9  University Medical Center, the law is unsettled, at the time of

10 the violation of the automatic stay.

11      The second issue is, assuming that University Medical

12 Center sets forth the correct standard for determining

13 willfulness, was the law unsettled, at the time of California

14 Coast's violation of the automatic stay, a violation which

15 California Coast, in its submissions to me, has admitted?

16      And the third issue is whether the Bankruptcy Court in this

17 case, having followed the decision in In Re: Mu'min, was

18 correct in determining that the Bankruptcy Abuse Prevention and

19 Consumer Protection Act of 2005, quote, legislatively overruled

20 the decision in University Medical Center, and in concluding

21 that the case, that is, University Medical Center, is

22 inconsistent with Section 362(k) because the standards that

23 were set forth in University Medical Center for determining

24 willfulness, that is, reliance upon persuasive legal authority

25 and the law on the issue being sufficiently unsettled, are no

longer applicable, in light of the limited expressed statutory

good faith exception set forth in Section 362(k), which applies

only to good faith violations of 362(h), which, in turn,

relates only to actions taken in the good faith belief that the

automatic stay has been terminated because a debtor has failed

to perform his or her obligations under Section 521 in a timely

manner.

    Those, as I see it, are the issues. Mr. Daar, will you be

presenting argument?

    MR. DAAR: Yes, I will, Your Honor.

    THE COURT: If you would be kind enough to address those

issues, that will be useful to me. Please understand, if I

interrupt you, at some point in your argument, it's not because

I want to be rude, but because I have a question, and it's

useful to me to get an answer, as you're presenting your

argument.

    MR. DAAR: Very well, and thank you, Your Honor.

    THE COURT: You're welcome.

    MR. DAAR: And I don't dispute your factual recitation, just

to make that clear.

    So the first issue, What is the standard for willfulness?

It should be a very easy pure issue of law because University

Medical Center is the law of the Third Circuit, it remains the

law of the Third Circuit, and I'll address in a moment, it's

also very consistent with the recent United States Supreme

1  Court decision in Taggart, which you have briefs on.

2  You know, essentially --

3       THE COURT: Right off the bat here, I'm stopping you, I'm

4  sorry.

5       I don't see Taggart as being particularly useful to us, to

6  either side in this discussion, because Judge Justice Brier, at

7  the very end of the opinion, makes it very clear that the

8  standards are different and that they were expressing no

9  opinion, with respect to 362, particularly, since, as he points

10 out, that section of the Bankruptcy Code includes the word,

11 willful, whereas, Section 523, I believe it was, does not.

12      So I'll be happy to hear why you think it's useful, but I'm

13 troubled by that attempt to shed light on our issue, based on

14 what was said in Taggart. But please go ahead.

15      MR. DAAR: Just to address the Taggart issue. It's not

16 controlling, there's no question, we don't claim it is, it

17 says, on its face, it's really dealing with discharge, which is

18 not here. However, the concept of the law being unsettled,

19 resulting in fundamental due process concepts that there would

20 be no willful violation -- maybe a violation but not a willful

21 violation of the Bankruptcy Code -- does connect because, one,

22 it's a similar standard that was done in Taggart.

23      And, second, it's very noteworthy, I think, because you're

24 being urged to ignore University Medical Center, based on no

25 clear legislative history, which Mu'min, by the way,

acknowledges, that there's nothing conclusive, so you have no legislative history. And Mu'min, really, by itself, is sitting here claiming that the Third Circuit was implicitly reversed. I'll get to that in a moment.

But to address Taggart for a moment, so the strict liability approach, which is, essentially, what the Bankruptcy Court here followed, that concept, under similar thoughts of what's fair due process, do you want parties having to go to District Courts to get guidance in Bankruptcy Courts?

Taggart addressed all that and said we don't want that, and that's why it came up with a standard of, You need no fair ground of doubt for a standard for what would be, essentially, a willful violation.

But in Taggart, it's also very interesting that the Supreme Court went out of its way, while acknowledging it wasn't addressing the automatic stay, to specifically note -- and I think it's nothing more than a unanimous signal from the Court -- that the word willful, as used in the automatic stay, may not be strict liability, they address the issue, and they went on -- and the Supreme Court doesn't have to do these things -- and then made the note with the citation of authority for it, that the word, willful, is a word the law does not typically associate with strict liability, which is, essentially, what we're here today discussing as to whether University Medical Center is the standard and whether it was, somehow, reversed

1  without being made clear by Congress.

2      So Taggart, I think, does provide that part of guidance,

3  because those are words that they didn't have to use or

4  address, and it's at the end of the very decision, Your Honor,

5  I believe.

6      THE COURT: Yes, it is, indeed.

7      MR. DAAR: Again, why did they bother to say that, without

8  making it a holding, because it wasn't before the Court, is, I

9  think, important for what's here, because you're being urged

10  not to follow established Third Circuit --

11      THE COURT: No one -- correct me if I'm wrong here, either,

12  counsel -- no one is suggesting that the standard ought to be

13  or is, under 362, strict liability, is there? Are you

14  contending there's strict liability?

15      MR. SABATINI: Your Honor, it's not strictly strict

16  liability, but I think that it is akin to a strict liability

17  standard. I think most of the cases interpreting 362, not just

18  in the Third Circuit but around the country -- have held what

19  the Third Circuit said, most recently, in Lansaw, which is not

20  to be confused with Lansdale, but in Lansaw, the Circuit cites

21  to Lansdale, and it says;

22      "It's a willful violation of the automatic stay when a

23  creditor violates the stay with knowledge that the Bankruptcy

24  Petition has been filed."

25      I mean, that sounds like --

1    THE COURT: That seems to go beyond University Medical

2 Center, doesn't it?

3    MR. SABATINI: Right. I think it's hard for the Third

4 Circuit to reconcile all of its case law on this issue.

5    THE COURT: I'll give you a chance to talk about this. I'm

6 sorry, Mr. Daar. Go ahead.

7    MR. DAAR: Your Honor, I think we're in agreement,

8 essentially -- and this is why University Medical Center

9 exists, I believe -- the law is generally clear that, in an

10 automatic stay violation, that if there's a violation and it

11 causes actual damages or injury, which is another issue we need

12 to address, because that's part of the requirement to get to

13 willfulness, it is, somewhat, of a strict liability standard.

14    However, University Medical Center fills an important gap,

15 which is why it's similar to the concept in what was addressed

16 by the Supreme Court in Taggart, which is, fundamental issues

17 of due process and notice require that if a party cannot, under

18 the University Medical Center standard, willfully violate the

19 automatic stay, when the law is not clear, because it's

20 unsettled, which is only there because, otherwise, it is a

21 strict liability-type of standard. And that's exactly what we

22 have before the Court today, and that's why it's so important.

23    So, for example, under the concept being asserted by the

24 Appellee and used by the Bankruptcy Court, which is a strict

25 liability standard, if you violate it, it's willful.

1    THE COURT: But your actions have to be intentional, even if

2  you're not intending to violate the stay, your actions still

3  need to be intentional.

4    MR. DAAR: Actually not.

5    THE COURT: Isn't that what University Medical Center says,

6  though?

7    MR. DAAR: I'm sorry?

8    THE COURT: Isn't that what University Medical Center says?

9  Isn't that what Atlantic says?

10    MR. DAAR: University Medical Center, basically, I think, a

11  fair read, acknowledges that the standard would be as a

12  violation would be deemed willful that there's an actual

13  injury. However, if the law is unsettled, there can't be,

14  because it's fundamentally unfair, if you don't have that

15  guidance or it's not clear to be a violation.

16    THE COURT: Well, let me talk about the law being unsettled

17  here, because I'm having a great deal of difficulty with the

18  concept that the law is unsettled, with respect to the

19  obligation of a creditor, in this case, an institution such as

20  California Coast University, I'm having difficulty with the

21  concept that the law is unsettled, as to whether that

22  institution was required, in order to avoid a violation of 362,

23  to turn over a transcript and, in fact, a transcript with a

24  graduation date in it.

25    I'm having great difficulty accepting the proposition that

1  the law is unsettled on that.

2      MR. DAAR: Your Honor, one, it's easy in this case because

3  the Bankruptcy Court acknowledged itself that the law was

4  unsettled, because it recognized it wouldn't have imposed

5  punitive damages because the law was unsettled, and that's in

6  the Bankruptcy Court's decision.

7      THE COURT: I'm not so sure the Bankruptcy Court was right,

8  but go ahead.

9      MR. DAAR: Mu'min also acknowledged -- and that was a

10  transcript case -- that the law was unsettled. Mu'min, of

11  course, is different, because, in Mu'min, the University

12  refused to provide -- believing it didn't have to under the

13  law -- provide a transcript.

14      And the Mu'mun Court recognized that the law was unsettled

15  but found that it did, and also, to do so, it had to

16  essentially find that Congress, without saying so, had reversed

17  University Medical Center, because, under University Medical

18  Center, if the law is unsettled, there wouldn't have been a

19  willful violation. May have been a violation but not a willful

20  violation, which triggers attorney's fees and costs.

21      THE COURT: Well, I've got a statement from you in your

22  submissions that there's no dispute that the automatic stay was

23  violated; correct?

24      MR. DAAR: It was disputed in the Trial Court, in the

25  Bankruptcy Court --

1    THE COURT: But not before me.

2    MR. DAAR: -- but it has not been disputed in the appeal.

3    THE COURT: Right, exactly.

4    MR. DAAR: And, frankly, the transcript was provided before

5    any legal action was ever commenced, unlike Mu'min, where

6    Mu'min was ordered to provide a transcript.

7    THE COURT: And I get that, and I respect that point that

8    you did provide the transcript, but you had no graduation date

9    in it, and that, to me, allows me to conclude that the

10   transcript is no transcript at all, that its effective use has

11   been eviscerated by the absence of a graduation date.

12   From the record, what I glean is, the only reason there was

13   no graduation date was because there was $6300 unpaid.

14   MR. DAAR: I'm not sure if that's a fair reading of the

15   record. First of all, we're talking about a --

16   THE COURT: That's what Ms. Aleckna testified she was told

17   when she spoke with Ms. Cenina, that that was the reason why

18   she wasn't getting a graduation date.

19   MR. DAAR: I'm not sure how material it is, but if it helps

20   this oral argument, this is a distance learning school, so a

21   student doesn't graduate with a class, they graduate when they

22   request to graduate, because they can continue taking classes.

23   THE COURT: Understood.

24   MR. DAAR: So it's unlike a traditional school where you're

25   in a semester, a semester ends, you graduate. In this case,

1  we're talking about an issue of an automatic stay, sort of, an

2  injunction, essentially, which is to not do things. Here, the

3  issue, which is completely novel, there's no law, period, on

4  this, and that's not the issue of whether or not --

5      THE COURT: There's no law on what?

6      MR. DAAR: On whether or not you have to go -- so the stay

7  says you're not supposed to, essentially, collect the debt. So

8  the concept would be, you're not supposed to do something that

9  would be deemed to be violating that stay to maintain the

10  status quo with your creditors.

11      In this case, that's been turned upside down, because the

12  idea that a transcript, particularly, in the context of a

13  distance learning school where it's, frankly, not at all clear

14  when somebody graduates, at all, you have to affirmatively go

15  in and add something that never was there, in order not to

16  violate something maintained as status quo, is completely

17  contrary to the whole concept of why you would have an

18  automatic stay.

19      This is an affirmative injunction-type of approach, which

20  is -- it's one thing to show a transcript, it's another thing

21  to then add something to a transcript versus just keeping it

22  the same, which is all you're supposed to do.

23      THE COURT: She was entitled to a transcript that said she

24  graduated, wasn't she?

25      MR. DAAR: I would respectfully disagree with that.

1    THE COURT: And why would you disagree?

2    MR. DAAR: Because she had never requested to graduate, in

3  all the time going back to her last taking classes, which I

4  think was in 2009, so we're talking about years earlier --

5    THE COURT: But, certainly, in 2012, she requested a

6  transcript and requested there be graduation dates inserted,

7  did she not?

8    MR. DAAR: No, that's not correct. In fact, when she asked

9  for the transcript -- it's in our opening brief citing to the

10  record in the Bankruptcy Court -- the issue of the transcript

11  not having a graduation date, which is just the way it is, the

12  concept that you have to affirmatively do something is not part

13  of an automatic stay, essentially, an injunction, it's not a

14  mandatory injunction to do something, which I'm sure this Court

15  can appreciate, because mandatory injunctions are very

16  different than a prohibitory typical injunction.

17    THE COURT: Are you telling me she did not ask for a

18  transcript with a graduation date? Are you telling me that?

19    MR. DAAR: Yes, I am.

20    THE COURT: Do you agree with that?

21    MR. SABATINI: No, Your Honor.

22    THE COURT: Tell me about it.

23    MR. SABATINI: Well, if I can find the -- on August 7, when

24  she called and asked why the transcript doesn't have a

25  graduation date on it, certainly, that's, at a minimum --

1  THE COURT: I'm going to stop right here and we're going to

2  pinpoint this, because this, to me, is essential. I want to

3  know whether or not there's a legitimate dispute on this issue,

4  before we go any further.

5  MR. DAAR: That's fine, Your Honor.

6  THE COURT: Do you have the record?

7  MR. DAAR: I will refer the Court --

8  MR. SABATINI: I'm sorry, Your Honor?

9  THE COURT: Do you have the record?

10  MR. SABATINI: Yes, I do, Your Honor.

11  MR. DAAR: I don't disagree with what you just heard, but it

12  needs one more step or two.

13  MR. SABATINI: Do you want me to bring the record up?

14  THE COURT: If you represent to me you're reading the

15  record, read it.

16  MR. SABATINI: So the part that I have right now is on a

17  different issue, it's on the issue of the question that you

18  asked before, whether she requested it. I'm sorry,

19  whether -- the statement that they have to affirmatively

20  request a graduation.

21  So this is the testimony of California Coast University's

22  witness.

23  My question:

24  "QUESTION: So if a student has completed the requirements

25  for graduation, and they request a transcript --

1  "ANSWER: Yes.

2  "QUESTION: -- the transcript that they receive will

3 indicate that they graduated?

4  "ANSWER: Yes, if they had been processed for graduation, it

5 would indicate they've graduated, if they've met all the

6 requirements.

7  "JUDGE OPEL: Do you know of any reason, other than

8 non-payment, why Ms. Aleckna's transcript was not a graduate

9 transcript?

10  "THE WITNESS: No, she hadn't been processed for graduation,

11 as there was -- there was a hold on her account and --

12  "JUDGE OPEL: Are you saying --

13  "THE WITNESS: -- there's a financial obligation.

14  "JUDGE OPEL: Do you -- you're not aware of any other reason

15 than lack of payment?

16  "THE WITNESS: No."

17  THE COURT: Who was that witness?

18  MR. SABATINI: Angela Cenina. Then it continues with my

19 questioning.

20  "QUESTION: Didn't she ask to graduate on August 7?

21  "ANSWER: No, she had asked why her transcripts didn't say,

22 Graduate. Well, I didn't have a graduation date.

23  "QUESTION: That's not enough of a request from a student to

24 bring to your attention the fact that they've satisfied the

25 requirements, other than the financial ones?

1  Before, you said that --

2  "ANSWER: Yeah.

3  "QUESTION: -- there's no official, there's nothing in the

4  handbook that says that they have to tell you, I want to

5  graduate, that once you are aware that the requirements have

6  been satisfied, that you process the graduation?

7  "ANSWER: Sometimes.

8  "QUESTION: Here, she called in on August 7, 2012, over

9  three years ago, and alerted" -- and then there's an objection

10  and Judge Opel sustains it. That's the end of that part.

11  Let me find something for you on -- I think Judge Opel's

12  opinion actually -- but, at a minimum, the amended counterclaim

13  that was filed, which complained that Coast had not provided

14  her with a transcript with a graduation date, that's certainly

15  a request that they provide a transcript with a graduation

16  date.

17  As of the time of trial, you know, several months or a year

18  later, they still had not made a decision as to whether they

19  would ever provide a graduation date.

20  MR. DAAR: And, Your Honor, what I was trying to add is the

21  fact that the transcript never had a graduation date nor was

22  she ever issued a diploma, which is, essentially, the position

23  taken 17 months after this claim was first filed against the

24  University for violating the Bankruptcy Stay, the issue of a

25  transcript missing a date of graduation or the issuance of a

1 diploma was never part of the case. And that is clear.

2    And, also, it was Aleckna who filed a Motion to Amend the

3 claim 17 months after it was filed, in response to a Motion for

4 Summary Judgment to add that issue, because it was not part of

5 the case. The only issue before the Court for 17 months was,

6 Did you failing to issue a transcript within a shorter period

7 of time be a violation of an automatic stay? That was what this

8 case was about.

9    THE COURT: Let me read from Judge Opel's opinion and then

10 I'll let you continue. This is at Pages 10 and 11. And I'm

11 quoting from it.

12    "The record reveals that Coast ultimately did send a

13 transcript of academic records dated July 27, 2012 to Aleckna."

14 A copy of this two-page document, Aleckna Exhibit 5, was

15 admitted into evidence. Trial transcript 43.

16    "The upper right-hand corner of Page 2 of the transcript

17 includes date of graduation with a blank following it. This

18 joins the issue of whether releasing a transcript without a

19 graduation date to a debtor/student who has completed all of

20 the academic requirements for graduation, because of an unpaid

21 debt to the institution, constitutes a violation of the

22 automatic stay.

23    "At trial, Ms. Cenina, Coast's registrar, acknowledged that

24 Aleckna had completed all her coursework. When asked why

25 Aleckna was not processed for graduation, she replied, quote,

1  She has not met her financial obligation". Transcript at Page

2  43.

3      I'm having difficulty here understanding that there's a

4  dispute on this issue. I mean, it's pretty clear from the

5  transcript and the record that the reason that Ms. Aleckna

6  didn't get her transcript with a graduation date was,

7  apparently, as Ms. Cenina testified, she has not met her

8  financial obligations.

9      Is California Coast's position that that's not true?

10     MR. DAAR: No, but the part I wanted to just add to this,

11 because this is what puts it in context, one, at the time of

12 this trial, there was no discharge, the debt was still pending

13 as a debt to be addressed in the Bankruptcy.

14     So the concept that, before there's a discharge, to avoid

15 an automatic stay, which just maintains the status quo, you're

16 supposed to then go in and affirmatively do things without a

17 discharge of adding a graduation date that wasn't in the

18 transcript because it was on hold three years earlier, to issue

19 a diploma, which had never been requested because everything

20 was on hold, is contrary, I would assert to you, what an

21 automatic stay is all about, because that is, maybe, what

22 happens after it gets discharged and no longer owed.

23 But in the meantime --

24     THE COURT: But giving a transcript without a graduation

25 date is coercive, it's coercive. You're giving somebody

something that isn't worth anything, if they can't represent to the public, to another educational institution or an employer that they graduated.

MR. DAAR: Hypothetically, Your Honor, if that debt was never discharged, was still owed, why would Ms. Aleckna, hypothetically, be entitled to have a graduation date, which was never requested, or a diploma? That's the reason why I'm making this position.

By the way, the record supports what I'm urging you to find, that it's, until later on, when there's no debt, that the University would have to affirmatively do something. Because if you look at what happened in this case, the record shows that on August 13, 2012, after the transcript was provided, before there was a claim filed alleging only that the transcript was delayed in being provided, not that there was something missing from it, that Aleckna's own legal counsel reviewed and sent an email with Aleckna and Aleckna's legal counsel left a detailed message for Aleckna and asked Aleckna if the graduation date was actually necessary.

And that's in the record at AA 229 to 231 and 416. And that, also, at trial, Aleckna was asked if she had ever contacted California Coast University after that date, regarding the missing graduation date, and she testified, Probably not. And I'm not positive. And that's AA 229, 231.

But while the debt is pending, to do nothing more than just

1  maintain the status quo is all that happened here. If the debt

2  was discharged and the school, then, didn't follow a request to

3  graduate or a request for a graduation date, that would be a

4  different issue.

5      THE COURT: Why did you stipulate that the automatic stay

6  was violated here?

7      MR. DAAR: For purposes of appeal, the Trial Court found,

8  and the only issue we are addressing is whether it was willful.

9  Because if it wasn't willful -- we have already complied with

10  Judge Opel's Order.

11      THE COURT: You're making an argument that suggests that

12  your stipulation is something you're reneging on.

13      MR. DAAR: Well, I'm really here just to address whether it

14  was willful.

15      THE COURT: I understand, but when you make a Judicial

16  representation, as you have in your submissions, that's an

17  admission that I hold you to. You're stuck with that.

18      MR. DAAR: But we didn't raise it on appeal. I don't think

19  we stipulated to anything, other than we complied with the

20  order, we're disputing whether or not the word is willful, is a

21  violation here, because there is no law that's been ever cited

22  to, there is nothing that was cited to the Bankruptcy Court on

23  the issue of having to affirmatively add a graduation date and

24  issue a diploma, while there's no discharge, and that is,

25  essentially, the position of the Appellant.

1    We were merely trying to challenge the legal issue, so it's

2  not a factual dispute, over whether or not, even if there was a

3  violation, which is what -- we're not challenging here, other

4  than I'm responding to your questions on the issue of the added

5  claim for failure to violate -- I'm sorry -- failure to insert

6  a graduation date, that it still could not be willful, which is

7  the point here, because there is no law that would ever suggest

8  that you have to affirmatively, while there's no discharge, add

9  a graduation date --

10   THE COURT: You're missing, I guess, the point of my

11  question, and, perhaps, that's because I didn't phrase it as

12  clearly as I should.

13   To use University Medical Center in your favor, you have to

14  assert and convince me that the law was unsettled and that

15  there was persuasive authority in favor of the position taken

16  by California Coast University.

17   Now, my point to you is, as I see the state of the law,

18  it's not unsettled as to whether or not it is a violation of

19  the automatic stay to refuse to give a transcript, and, in

20  particular, it's not unsettled that that transcript has to be

21  complete, and if that includes a graduation date, as it should

22  have here, then, there was a violation of the stay, such that

23  it was a violation of settled law, such that it was willful.

24   MR. DAAR: Let me address that. The point I've been trying

25  to make, in case it wasn't clear, I apologize if it wasn't --

1  with the issue of the graduation date, I don't believe there's
2  any law that's before anyone here on that point.

3    There is law on whether issuing a transcript, none of those
4  cases deal with, Is there a need to be a graduation date, let
5  alone one added, when it wasn't there in the first place? Or
6  issuing of a diploma? And that's important because Mu'min
7  recognized the law was unsettled on just issuing a transcript,
8  not the secondary part that we were just discussing --

9    THE COURT: But if you issue a transcript that is truncated,
10 as this one was, you've not fulfilled your responsibility.

11   MR. DAAR: But if the transcript is the transcript, and
12 that's what you provide, where is there ever --

13   THE COURT: There's a place on the transcript for a
14 graduation date, is there not? Doesn't the form -- the
15 transcript form indicate, Graduation date, and there was a
16 blank here?

17   MR. DAAR: Just the way the transcript is existing, at the
18 time of the automatic stay.

19   THE COURT: Precisely. And you see, on behalf of California
20 Coast, there's no obligation to give a complete transcript?

21   MR. DAAR: When the debt is still pending?

22   THE COURT: Yes.

23   MR. DAAR: In order to avoid violating an automatic stay?
24 No.

25   THE COURT: Yes.

1    MR. DAAR: But the issue here is --

2    THE COURT: Slow down. Did you say, no, you don't see an

3 obligation to do that?

4    MR. DAAR: Personally?

5    THE COURT: Well, on behalf of your client.

6    MR. DAAR: I know, but on behalf of my client, no. However,

7 the law is far from clear, one way or another, as to whether or

8 not there is such an obligation, because there is no law, this

9 is a matter of first impression as before this Bankruptcy

10 Court.

11    THE COURT: What is the matter of first impression?

12    MR. DAAR: Whether or not a transcript has to affirmatively

13 have the graduation date added to it, whether, while a debt is

14 pending, without being discharged, you have to affirmatively

15 issue a diploma, in order to avoid an automatic stay. Those are

16 all issues that I don't believe there's any law -- even the

17 Third Circuit has the Johnson case -- the Third Circuit, not a

18 Bankruptcy Court decision --

19    THE COURT: Edinboro is not on point, Edinboro is not on

20 point, it's not on point. It's not going to help you here.

21    Let me hear from the other side. I'll call you back.

22    MR. DAAR: Yes, I would like to address some other points.

23    THE COURT: No, we're not done. We have plenty of time.

24    MR. DAAR: Thank you, Your Honor.

25    MR. SABATINI: Your Honor, if I could start, I guess, with

1  some of the statements opposing counsel made that I don't agree

2  with.

3       So he said, at the time of trial, there was no discharge,

4  and the reason for that statement was to justify the refusal

5  -- the way I understood the statement -- was to justify the

6  refusal to provide a complete transcript. That's true -- the

7  statement that, at the time the request for the transcript was

8  made, there was no discharge, is true for every single case

9  that is found, that it's a violation of 362 to not provide a

10  transcript, because 362 and the discharge are never in place at

11  the same time.

12       THE COURT: I understand that.

13       MR. SABATINI: So the fact that, at the time of trial, there

14  was no discharge is -- that's true, but it's not relevant, in

15  light of all the authority that says that's a violation of 362.

16       There's a representation that the Bankruptcy Court said

17  that the law is unsettled. I don't think that the Bankruptcy

18  Court's statement went that far. If you look at Judge Opel's

19  opinion, when he declined to award punitive damages, he said he

20  recognized there was some authority, you know, for the

21  proposition that a transcript -- that their conduct, whatever

22  it was, might have been acceptable.

23       But he wasn't going so far as to say that the law was

24  unsettled. To me, I read it as, I don't want to give punitive

25  damages, and here's, maybe, a bone that I can throw to the

1  Defendant.

2      The statements that they're maintaining the status quo, and

3  that that's okay, Judge Opel actually had a case, In Re:

4  Iskric, where he found it was a violation of the automatic stay

5  for a creditor or a debt collector to not take action to have a

6  bench warrant vacated where the debtor was in jail. The debtor

7  is in jail on a bench warrant that's issued after the debtor

8  fails to comply with discovery, right, so it's all collection

9  conduct. And the debtor filed a bankruptcy case.

10     Well, the status quo, at the time the bankruptcy case is

11  filed, is that the debtor is in jail. If the automatic stay

12  allowed you to just leave the status quo in place, then, it

13  would have been okay for the debt collector to do nothing to

14  have that debtor released from jail.

15     THE COURT: Let me ask you a question, in connection with

16  the status quo and 362. Certainly, a 362 is intended to stay

17  all forms of collective action, isn't that true -- collection

18  action, excuse me.

19     MR. SABATINI: There are a number of exceptions, but

20  generally, yes.

21     THE COURT: That's the general purpose of it. Do you view

22  the failure of California Coast, on request to provide a

23  transcript, as a violation of a stay because it is an attempt

24  to collect a debt -- the $6300 that Ms. Aleckna hadn't paid?

25     MR. SABATINI: Absolutely. As you said, it's coercive. In

1  fact, it's the only way that California Coast collects debts.

2  In the record, there's testimony that they don't use debt

3  collectors. There was one instance out of over all the years

4  where they sued somebody --

5      THE COURT: But there's no dispute, they come up with the

6  transcripts, do they not?

7      MR. SABATINI: Yes.

8      THE COURT: And at that point, are they no longer in

9  violation of the stay?

10     MR. SABATINI: No, because, as you said, the transcript

11 without a graduation date is not very useful. Judge Opel

12 likened it to a letter of recommendation without a signature.

13     THE COURT: Do you think the law on that point is

14 unsettled -- again, assuming University Medical Center is still

15 good law -- do you believe the law on that point, specifically,

16 whether transcripts must be furnished on request to avoid

17 violating the stay, and that the transcript must have a

18 graduation date, do you believe the law is unsettled on that?

19     MR. SABATINI: No. The first half of that sentence,

20 certainly, certainly not unsettled, certainly well-settled that

21 you have to provide a transcript.

22     I don't think that there are many decisions that discuss

23 the issue, I'm not aware of any decisions that discuss the

24 issue of whether a graduation date has to be added. I don't

25 know that before In Re: Iskric there were any decisions whether

1 a debt collector has to vacate a bench warrant. Just because

2 this exact set of facts hasn't come up before in a published

3 opinion doesn't mean that it's so divergent from all of the

4 enormous amount of authority that says you have to provide

5 transcripts, that it, somehow, creates an unsettled state in

6 the law.

7     THE COURT: Now, University Medical Center, in addition to

8 saying the law was unsettled, also offered that Medicare in

9 that case, in particular, the Medicare statute, as a basis for

10 its statement, Medicare had persuasive authority to support its

11 position.

12     MR. SABATINI: Correct.

13     THE COURT: Now, is there persuasive authority, from your

14 perspective, to support the position that California Coast took

15 here? And Mr. Daar, I'm going to ask you the same question when

16 it's your turn.

17     MR. SABATINI: No, absolutely not, and I'm glad you asked

18 this. It's in my outline. That's a critical sentence in their

19 brief. However, the secretary also had persuasive legal

20 authority, right?

21     THE COURT: Yes.

22     MR. SABATINI: So that -- in Coast -- in their reply brief

23 on Page 12, they say;

24     "There are no cases dealing with this situation, and the

25 law is not at all established as to whether a college would

1 have to proactively insert a graduation date in a transcript to
2 avoid violating the automatic stay, let alone willfully
3 violating the automatic stay."

4     So if that's true, which I don't agree with, I think the
5 law is clear, but even giving them the benefit of the doubt on
6 that argument, they have no persuasive legal authority, they
7 can't possibly meet the University Medical Center defense.

8     If you didn't have other questions, there's just a couple
9 things.

10     THE COURT: Go ahead.

11     MR. SABATINI: One is --

12     THE COURT: I have questions but finish your thoughts.

13     MR. SABATINI: When you outlined the three points at the
14 beginning that you thought were critical, I was a little
15 dismayed that the issue of waiver or forfeiture wasn't among
16 them.

17     But I recognize that the reason you might think that it
18 hasn't been waived is because a number of the statements that
19 were made in California Coast's papers gives the impression
20 that this issue of University Medical Center was actually
21 presented to the Bankruptcy Court when it never was.

22     So on Page 5 of its reply brief, they say that the
23 Bankruptcy Court did not follow University Medical Center --
24 and this was part of your recitation -- instead the Bankruptcy
25 Court follows Mu'min to conclude that University Medical Center

1 is no longer valid since it was implicitly overruled by

2 Congress. This is completely false.

3     The Bankruptcy Court never mentioned University Medical

4 Center, so the Bankruptcy Court did follow Mu'min, right,

5 because Mu'min said it's a violation of the automatic stay to

6 not release transcripts, but they did not follow Mu'min for the

7 proposition that University Medical Center is no longer valid,

8 which is certainly the impression that I had of that argument

9 in their brief.

10     THE COURT: Are you suggesting that wasn't raised?

11     MR. SABATINI: Absolutely. University Medical Center was

12 never raised in the Bankruptcy Court.

13     THE COURT: Do you agree with that?

14     MR. DAAR: Your Honor, Mu'min is the case that found that

15 University Medical Center was implicitly reversed, and that

16 case was, over and over again, argued to be wrong, and the

17 University contended the law was not clear.

18     And it's in the record, we cite to it many times,

19 specifically, on this point in the reply brief, and I can give

20 you the page, if you'd like, as to where the arguments were

21 made.

22     THE COURT: So am I understanding you correctly, Mr. Daar,

23 that your contention is that inherent in the discussion

24 regarding In Re: Mu'min is necessary consideration of the role

25 of University Medical Center, inasmuch as Mu'min suggests that

1    that case has been legislatively overruled?

2        MR. DAAR: Because it's Mu'min, that's the case that found

3    that the refusal, which, in this case, wasn't really the issue,

4    that was provided already long before it was a claim, and there

5    they were arguing on the other side the University v. Johnson

6    case, the Third Circuit, but found that the law being unsettled

7    went to the effort -- that's why they had to go to the effort

8    in Mu'min, which isn't that long ago of a case -- that that's

9    not good law anymore, the law being an unsettled standard of

10   University Medical Center, and, therefore, we find the strict

11   liability approach and we find that refusal to provide a

12   transcript wasn't a violation of the automatic stay, and so the

13   issue is before the Court throughout the proceedings, the

14   position of the law being not clear throughout the proceedings,

15   and, particularly, Mu'min, because Mu'min only gets to a

16   violation by finding that University Medical Center was

17   reversed, because of that strict liability standard they

18   applied.

19       THE COURT: You're contending that you did not waive that

20   issue before the Bankruptcy Court?

21       MR. DAAR: Exactly. And we also assert that, based on case

22   law and legal arguments, putting aside the record, irrespective

23   that it would still be a proper issue for this appeal, and

24   that's very specifically briefed in our reply brief in response

25   to the argument that it was somehow waived, on Pages -- bear

with me one moment -- Pages 2 through 9 of the reply brief,

just to direct your attention.

THE COURT: Thank you very much. Mr. Sabatini, you can stay

with that issue if you'd like, if you want to attempt to rebut

what's been said.

MR. SABATINI: So I don't think that opposing counsel is

saying that University Medical Center -- that the name

University Medical Center was ever given to the Bankruptcy

Court, I haven't heard that.

And, certainly, the argument -- so this is on Page 14 of

our brief. The explanation that, in all of the pleadings, they

never mention this case, and they had briefs, dispositive

motions, proposed findings of fact, conclusions of law,

post-trial brief, University Medical Center is never raised.

Then, they also talk about -- they say that they raised the

issue of there not being a, quote, willful, unquote, violation

of the automatic stay, right, because that's how University

Medical Center would come into play. University Medical Center

says it's not a willful violation of the stay if you acted with

that persuasive authority in your back pocket, right?

So Coast is saying that, Look, we raised the issue of

willfulness before the Bankruptcy Court a bunch of times. And

they give a cite to 10 locations in the record where they talk

about willfulness. But in none of those 10 locations are they

talking about the gloss that University Medical Center puts on

1 willfulness, they're simply talking about it, for example, they

2 say, in one of the locations, they cite;

3    "Coast did not commit a, quote, willful, unquote, violation

4 of the automatic stay because Coast did not act deliberately

5 with knowledge of the Bankruptcy Petition."

6    Right, that's the normal standard for willfulness. So the

7 entire discussion of willfulness to the Bankruptcy Court was

8 nothing like University Medical Center. Honestly, this is a

9 case that they didn't discover until after the proceedings

10 below were filed, and now they're trying to find things in the

11 record to --

12    THE COURT: All right, let me pose this question to you on

13 this issue of waiver. I think you would agree with me that my

14 jurisdiction, with respect to questions of law, is plenary.

15    MR. SABATINI: Correct.

16    THE COURT: Inasmuch as it is plenary, can I legitimately

17 decide this case without determining whether or not 1992 Third

18 Circuit precedent University Medical Center governs in the

19 case? I mean, can I really do that?

20    MR. SABATINI: I believe if -- I think that it's your

21 discretion to decide whether an issue has been waived or

22 forfeit is, perhaps, the more technically correct term, as we

23 explained in our supplemental brief.

24    THE COURT: But can I ignore -- and I don't disagree with

25 your proposition -- but I think what I'm being asked to do is

1 not reach a question that's central to the appeal, which is

2 whether there has been a change in the law, in the sense that

3 University Medical Center, saying what it said -- and we both

4 know what it said -- is no longer law as a result of the 2005

5 changes to the Bankruptcy law, which In Re: Mu'min

6 indicated -- In Re: Mu'min says that those changes

7 legislatively overrule University Medical Center.

8     I mean, it seems to me that I can't avoid reaching that

9 question. Tell me how I can.

10     MR. SABATINI: So -- and I apologize -- I don't apologize --

11 but I keep bringing up Bankruptcy Court opinions because that's

12 where I am most frequently.

13     So Judge Opel frequently says that when it becomes not

14 necessary to decide more, it becomes necessary to not decide

15 more -- I forget exactly how he says it, but it's along those

16 lines -- and I think if they've clearly forfeit the issue,

17 then, you don't have to decide whether University Medical

18 Center is still good law, because it's not something that they

19 raise below. And because we've been prejudiced by this. In

20 their brief --

21     THE COURT: Again, pardon me for interrupting you. But even

22 if I accept that proposition, I'm going to have to decide the

23 validity of the reasoning that's set forth in In Re: Mu'min,

24 which was adopted by Judge Opel in this case, am I not?

25     MR. SABATINI: Only in so for as Judge Opel was adopting the

reasoning as to whether it's a violation of the stay to not

provide a transcript, without the whole University Medical

Center gloss, but I don't think you need to -- the issue of

whether they have not willfully violated the stay because they

didn't act with the requisite intent was never brought up by

them, so I don't know that you need to get to what the law is

-- to determine the answer to that issue because they never

raised it.

If they had mentioned to the Bankruptcy Court, Hey, look,

we were relying on these other cases, we have this University

Medical Center defense, then, we would have conducted discovery

on the issue of whether that was actually true. Because they've

only relied on three cases, right, one of which you have said,

the Edinboro case, which is not on point.

The other two cases, they never mentioned until Judge Opel

mentioned them first. So if their Legal Department -- if they

went out and they did this survey of the law and they found 19

cases that said you have to give a transcript, and they found

Billingsley and Najafi that said you don't have to give a

transcript, they would be in the Bankruptcy Court saying, Hey,

look, we relied on Billingsley and Najafi, they wouldn't be

waiting for Judge Opel to bring those cases to their attention

before they start talking about them.

And we would have conducted discovery on the issue of

whether they thought that it was really a good bet, you know,

1   whether they had -- why they believed that they had persuasive
2   legal authority in their corner, when the score was 19 to 2
3   against them.

4       On the same issue of whether there's waiver, he mentioned
5   -- opposing counsel mentioned that they had -- they cited a
6   case, and the case they cited to was Huber. Huber gives you
7   discretionary power to address pure issues of law that have
8   been waived.

9       But the issue that was waived here is the factual issue of
10  whether California Coast could avail itself of the University
11  Medical Center defense. The issue that was waived is not a
12  legal issue. The issue that was waived is California Coast's
13  ability to come in and argue, Hey, look because of our
14  understanding of what the law was in 2012, this is why we acted
15  the way that we did.

16      If they had introduced evidence to support that type of
17  factual finding, then, it might be proper for you to decide the
18  legal issue of whether University Medical Center is still good
19  law.

20      THE COURT: So you're telling me that the record would show
21  that there's an absence of any reference to University Medical
22  Center as being justification for California Coast's actions,
23  at the time that they took them?

24      MR. SABATINI: Absolutely.

25      THE COURT: That's what you're telling me.

1    MR. SABATINI: Not only that, but, also, that there's an

2   absence in the record of any evidence that the cases they're

3   relying on -- all right, so University Medical Center is the

4   issue of willfulness. The cases that they're relying on are the

5   issue of whether you have to release a transcript, the two

6   cases they have where a transcript wasn't required to be

7   released, that there's an absence in the record of any

8   indication that they knew about those cases.

9    THE COURT: Your contention is that the law is well -- if

10   it's well-settled, it's well-settled in favor of the

11   proposition that the transcripts must be furnished and they

12   must be furnished with a graduation date. Correct?

13    MR. SABATINI: Absolutely.

14    THE COURT: And that would allow me, it seems, to decide

15   this case without ever reaching the University Medical

16   Center's -- the issue of whether University Medical Center

17   retains vitality, because I can certainly write that even if

18   University Medical Center is still good law, a law,

19   nonetheless, the reasoning there that there was persuasive

20   authority and the law was not well-settled is absent here.

21    MR. SABATINI: Absolutely. And one final point. Billingsley

22   and Najafi, they actually don't support them, at all, because

23   those two cases relied heavily on the fact that the debt that

24   was at issue was non-dischargeable, right.

25    And here, the debt was dischargeable. In Najafi, the Court

1  says, It appears to us that the college has a, quote, special

2  interest, closed quote, in transcripts of its students, unless

3  their debt is deemed non-dischargeable.

4      So in Najafi, they're expressly relying on that to excuse

5  the college from having to provide a transcript. Billingsley

6  wasn't as explicit, but Billingsley did say;

7      "A University does not violate the automatic stay by

8  withholding a transcript from a debtor who has defaulted on a

9  concededly non-dischargeable student loan."

10      So if you read those two cases --

11      THE COURT: Which I have.

12      MR. SABATINI: -- for this one point, I think it's pretty

13  clear they were relying on the fact that those debts were not

14  going to be discharged by the bankruptcy case, when they

15  excused it. So if you add that factor in, there's not a single

16  case to support the proposition that a university can withhold

17  the transcript for a debt that is going to be discharged in a

18  bankruptcy case.

19      THE COURT: I think it's on Page 7 of your submission and a

20  very lengthy footnote that you catalog all those cases, is that

21  right?

22      MR. SABATINI: I'll take your word for it. I don't have it

23  here.

24      THE COURT: I want to go back and talk about In Re: Mu'min,

25  because I'm having difficulty with the idea that I can decide

1 this case fairly and correctly without assessing whether In Re:
2 Mu'min is correct. That case, as we all know, indicates there
3 was a determination made by the Bankruptcy Judge that
4 University Medical Center was legislatively overruled by the
5 amendments of the Bankruptcy Code in 2005.

6     The essential justification for that was, according to the
7 Bankruptcy Judge, while there's no legislative history that we
8 can refer to, but nonetheless, the plain language of the
9 amendments to Section 362 compel the conclusion that University
10 Medical Center can't survive, given the narrowing of the Good
11 Faith Exception that 362 now carries after the amendments.

12     Now, doesn't that force me to deal with whether or not
13 University Medical Center is still good law, in the sense that
14 I've got to decide whether I want to follow In Re: Mu'min?

15     MR. SABATINI: I don't believe you have to, Your Honor, you
16 can find that they waived it, so you don't have to reach
17 University Medical Center, and that there was no unsettled
18 state of the law, that the law was clearly settled, so
19 University Medical Center is irrelevant.

20     THE COURT: Mr. Daar, you have the floor.

21     MR. DAAR: Thank you, Your Honor. Just to tie these things
22 together. So the failure to give the transcript, for it to be
23 willful, has to cause actual injury, and I want to get to that
24 at the very end here.

25     The issue of, Where is the law on what the Judge was

concerned about, having issued a transcript, as it exists, but having to put in a graduation date and issue a diploma? I would assert to you that nothing before you -- it's not in Judge Opel's decision, it's not in the briefs -- there are no cases on that point, and it is a point of not just something small, because the transcript was provided, it wasn't even an issue for 17 months in the case of it missing a graduation date, which shows you the importance of that and how it was very different, so that would be added as a separate claim.

That's what makes it very troubling to me that somebody could be found willfully in violation of the automatic stay. It's one thing to conclude it violated the automatic stay, but to make it willful, when there's no law providing any guidance on this point, it is a point that is very novel and a matter of first impression. None of the transcript cases deal with this issue.

The fact that -- again, we're dealing only with the issue of willfulness. The fact that Judge Opel, himself, in his decision, acknowledged that there was minority cases that provide -- again, Mu'min is sort of the one that sort of tips it all, based on dealing with the Johnson case --

THE COURT: Well, Stancil says that Mu'min is wrong, does it not?

MR. DAAR: Yes, Stancil says that. And dealing with the issue of whether or not there was a reversal, Stancil, I think,

1  very good, Your Honor, the D.C. Bankruptcy Court case very

2  thoroughly discusses why it disagrees with Mu'min, and more

3  importantly, for this Court, you should be guided by the Third

4  Circuit in Vistacare Group, which we cited to, because that's

5  the case from the Third Circuit itself that deals with the very

6  Bankruptcy Act in question and gives very strong guidance about

7  how the Court should be reluctant to accept arguments that

8  would interpret the Bankruptcy Code to effect a major change in

9  pre-code practice, which would be University Medical Center,

10 absent, at least, some suggestion in the legislative history

11 that such a change was intended.

12     And here, as we know, there is no legislative history on

13 this, period. Mu'min gets there by finding that, implicitly,

14 they must have done, in intent to reverse pre-code practice in

15 University Medical Center, but there really is nothing more

16 than just them coming to that conclusion in that case, the

17 Judge.

18     THE COURT: What's wrong with the Judge's determination in

19 Mu'min that the plain language of the change to 362 establishes

20 that the Good Faith Exception has been significantly narrowed,

21 to the point where University Medical Center is no longer good

22 law?

23     MR. DAAR: As Stancil addresses that point, I think, very

24 well, and you just mentioned, yourself, Your Honor, that

25 there's just nothing there that suggests that they were

intending Congress to reverse the issue of the law being

unsettled, it's a different point.

If the law is unsettled, where is the due process fair

notions of anyone knowing what they're not supposed to do? As

Stancil found -- again, this is the willful aspect, the

added-on layer, so we're only talking about that added-on

layer, not a violation of the automatic stay -- that no damages

are recoverable, says Stancil, because the offending party

would not act in violation of a command at which it had fair

notice, because the law is not as settled as it could be, which

is what University Medical Center adds to the code, and that's

what we would submit was the failure of the Trial Judge in the

Bankruptcy Court.

And where this all makes point, again, is the willful part.

You cannot have a willful violation, unless it caused actual

damages. And here, the transcript was issued long before any

claim was made, it was issued fairly promptly in the scheme of

the world of, you put in by mail a request for a transcript,

the University was provided the records it was asking for,

because they didn't get them, the bankruptcy filing, and when

they got it, they filed and responded within nine days by mail,

so whatever the mail time is in this wonderful world, with the

transcripts, as they exist.

So no actual injury was found by Judge Opel, as a result of

that, no actual injury was found by Judge Opel, with regard to

the failure to add, affirmatively, a graduation date or,

affirmatively, to issue a diploma, that was the finding of

Judge Opel. And without an actual injury, none of this matters,

because it couldn't be willful.

And, again, it's the willful that's on appeal here. If it's

not willful, then, you don't get to the issue of any award of

damages and you don't get to the issue of attorney's fees and

costs.

We also have this circular argument being made by the

Appellee that I just wanted to address briefly.

THE COURT: Go ahead.

MR. DAAR: So you have to have actual injury, that's very

clear, and here --

THE COURT: The statute does use the word, injury.

MR. DAAR: And Judge Opel cited to his own cases we provided

to you here. To get around that, the only finding of damages

was the interesting concept of having to attend one's own

trial. Fortunately, for everyone here, Ms. Aleckna wasn't the

CEO of Apple, because he was only awarded damages for attending

one's own trial, which, again, I would submit is a novel

concept.

The reason why it's important is because you don't get to

attorney's fees and costs under the Bankruptcy Code without

first there being actual injury, so, therefore, it's something

different than attorney fees, because you don't get to

1  entitlement of attorney's fees, unless there's first that

2  actual injury.

3      In this case, an easy way to resolve this appeal would be

4  to find there is no actual injury, and there was no injury as a

5  result of -- as found by Judge Opel -- of any of the issues on

6  the transcript. She had the transcript before she ever made a

7  claim, and the failure to have somebody affirmatively add a

8  graduation date and affirmatively issue a diploma caused no

9  damage in this case, so found Judge Opel, which is why no

10  damages were awarded.

11      THE COURT: Let me ask you a question here. Judge Opel does

12  award $230.19 here as damages, does he not?

13      MR. DAAR: For attending the trial, not because she was

14  damaged by any conduct done by California Coast University.

15      THE COURT: But he includes it as an element of damages

16  properly awardable under 362, does he not?

17      MR. DAAR: That is what he did, which is what we challenged

18  on appeal as not actual damages, compensable damages. Again,

19  had she been CEO of Apple, would I be now sitting here arguing

20  to Your Honor how unfair it would be that the CEO of Apple, in

21  one day, makes millions of dollars, potentially? I think that's

22  why we don't have such a concept, where attending a trial

23  doesn't, by itself, be your damages.

24      THE COURT: Let's assume for a moment that you're correct

25  and that Judge Opel erred when he awarded $230 for her

1  compensation in missing work as a legal secretary. Let's put

2  that aside for a moment.

3      Looking at 362(k), it seems to me that a fair reading of it

4  would be that, if an individual has been found to be injured by

5  a willful violation of a stay, they're entitled to recover

6  actual damages, and actual damages, the way the statute is

7  phrased, includes costs and attorney's fees.

8      So to the extent that I were to find that this woman was

9  injured, is it not the case that an element of damages in the

10  case of an injury are attorney's fees?

11      MR. DAAR: I would respectfully suggest, no, and tell you

12  it's no.

13      THE COURT: Tell me why.

14      MR. DAAR: The reason why is very simple. And by the way,

15  the context of this trial, by very competent bankruptcy

16  counsel, shows what I'm saying must be the case, because they

17  didn't put on evidence at the trial of damages of their

18  attorney's fees, the attorney's fees were not introduced into

19  evidence, because you don't get to an entitlement of attorney's

20  fees, under the case law, unless you have a willful violation,

21  and you don't get a willful violation without a finding of

22  actual injury, which means that you don't get to entitlement of

23  costs without that actual injury.

24      Here, with that actual injury, there may have been a

25  violation, but it's not willful, and without being willful, you

1  don't get an entitlement to seek post-judgment costs and fees.

2      THE COURT: I'm not sure I read the statute the way you do.

3  Again, it says;

4      "Except as provided in Paragraph 2, an individual injured

5  by any willful violation of a stay, provided by this section,

6  shall recover actual damages, including costs and attorney's

7  fees, and in appropriate circumstances, may recover punitive

8  damages."

9      I read that to mean that, unlike, perhaps, many other

10 statutes, certainly many other fee-shifting statutes, in a

11 discrimination area under 1983 and other places, I read this to

12 say that an element of damages, by statutory definition,

13 includes costs and attorney's fees.

14     MR. DAAR: We cited to, in our opening brief, by the way,

15 cases on this. If it will help the Court, I believe, it's at

16 Pages 18 through 20, I believe, are the pertinent parts of the

17 opening briefs.

18     But, again, if it was otherwise, wouldn't the Appellee at

19 the trial, as a requirement of establishing damages, put on, as

20 damages, evidence of their attorney's fees, which did not occur

21 in this case?

22     THE COURT: So you're saying there was no evidence at trial

23 presented that attorney's fees were incurred?

24     MR. DAAR: No, but the attorney's fees, what they were

25 -- obviously, implicitly, if somebody is there, there's

1  attorney's fees -- but my experience as a litigator, in any

2  litigation outside of bankruptcy or in bankruptcy, is, if an

3  element of your damages is your attorney's fees versus you're

4  entitled to attorney's fees after establishing an entitlement,

5  which is what I'm taking the position for you right now, to be

6  clear, you would put on at trial -- and I'm sure you see this,

7  at times, in those type of cases -- someone puts on at trial

8  evidence of their attorney's fees and what they are and what

9  the amounts are versus doing it after entitlement is determined

10 in a post-judgment proceeding.

11     That post-judgment proceeding is the approach that was done

12 here, and that's because -- and that's why Judge Opel, I

13 believe, came to findings -- the nominal damages of $231.19, I

14 believe it is, for attending one's trial, because without that

15 finding, there would be no entitlement to attorney's fees in

16 the case, because it would not be willful.

17     A violation of an automatic stay does not get you to

18 attorney's fees and costs, unless there's actual injury, and

19 that's the whole distinction of why we're focusing on willful

20 and why the University Medical Center is so pertinent and on

21 point here, in this case, particularly, as to the adding in of

22 an, affirmatively, a graduation date, because there's no law on

23 it.

24     THE COURT: Why isn't the fact that Ms. Aleckna didn't get

25 her transcript with a graduation date in it an actual injury?

1    MR. DAAR: Because, as Judge Opel found, it caused no injury

2 to her. She did not need it, she did not lose any rights or be

3 damaged by not having that. And, in fact, as shown by the

4 proceedings in the case, and you could take Judicial notice of,

5 it took 17 months for it to even become an issue in the case,

6 so it was an afterthought.

7    If it was an important issue that was causing damages, I'm

8 sure it would have been raised immediately and not 17 months

9 later. And Judge Opel, in the decision, found there was no

10 actual injury, other than her attending trial.

11    THE COURT: When you say, raised 17 months later, give me

12 your time frame. I'm not sure I follow you.

13    MR. DAAR: Sure, very simple. So this case started with the

14 University being requested to provide a transcript, there being

15 confusion over whether or not there was even a bankruptcy, you

16 know, that's clearly in the record --

17    THE COURT: So that's the beginning point you're talking

18 about?

19    MR. DAAR: The beginning point, and the transcript, as it

20 is, without anything affirmatively being done to change it, was

21 provided. And then -- two important notes -- one, there was a

22 claim then filed in September about six or seven weeks after

23 the transcript was provided, based only on failure to timely

24 file it -- I'm sorry -- based on an alleged violation of the

25 automatic stay by not being provided earlier than it was --

1   THE COURT: That was in the amended complaint, was it not?

2   MR. DAAR: That was the original counterclaim being made by

3 Ms. Aleckna.

4   THE COURT: Well, the counterclaim was amended to

5 allow -- to insert the claim of --

6   MR. DAAR: Seventeen months later.

7   THE COURT: I understand what you're saying.

8   MR. DAAR: In the meantime, it's noteworthy of the

9 following, Your Honor, and it's in our brief and it's in the

10 record, but just to make sure the point is there.

11   So this case had a weird side piece of history, early on.

12 There was a motion made by the Appellee Ms. Aleckna to enforce

13 a purported settlement agreement with California Coast

14 University over the payment of only money.

15   THE COURT: Ten thousand dollars.

16   MR. DAAR: Had nothing to do with the transcript. And that

17 was the beginning of this case. The concept that the transcript

18 should have a graduation date or a diploma should be issued

19 didn't exist, and the settlement was not enforced, because it

20 was found not to exist, but the one that was being pursued by

21 Aleckna did not even include this as an issue, which shows

22 everybody it wasn't an issue at the time.

23   THE COURT: Why should I care about a proposed settlement

24 that didn't come to fruition and which would require me to

25 divine what Aleckna's motives were in even proposing that, how

1 is that useful to me, at all?

2     MR. DAAR: Only in the context of the issue of why Judge

3 Opel found no actual injury, based on the transcripts or the

4 transcript not having an added date or the issuance of a

5 diploma, and it's consistent that with, you know, looking at

6 the whole of the evidence, that Judge Opel was correct on that

7 point that there was no damages resulting from the failure to

8 put in, affirmatively, a graduation date or affirmatively issue

9 a diploma, in order not to violate the automatic stay. That's

10 the only reason why I'm mentioning it. Otherwise, you're

11 correct, Your Honor.

12     THE COURT: All right, if there are other points you'd like

13 to make, I'll be happy to hear them, if not, I'm going to give

14 you both a chance to kind of sum your positions up.

15     MR. DAAR: One moment, Your Honor. Looking at your three

16 issues, I want to make sure I've addressed them well enough in

17 all of the discussions we have had among counsel and you.

18     Other than University Medical Center, which I believe is

19 clearly the law, and until somebody says otherwise, I believe

20 you and the Bankruptcy Court, this District Court, should be

21 following it.

22     With regard to the one thing I think I should amplify, as

23 to whether or not the law was clear on the transcript, clearly,

24 there are more cases and less cases saying otherwise, but there

25 are clearly strong minority cases saying that the University

1 didn't have to provide a transcript in the first place, but

2 that's not really the issue here for you to focus on, because

3 the transcript was provided without any legal action taken.

4     The issue before you, which is the one that really is

5 completely unsettled, when issuing a transcript, in order to

6 avoid a violation of an automatic stay, is there an obligation

7 to affirmatively put in a graduation date, prior to a

8 discharge, and to affirmatively issue a diploma?

9     And I would submit to you there's no case law one way or

10 another on the point, and, therefore, it is clearly unsettled,

11 and to find that the University willfully violated the

12 automatic stay by not doing those things is something that the

13 University should have and did not have any guidance from any

14 Court, is something to be expected of it.

15     In fact, here, 17 months went by without it being even

16 mentioned as an issue in the case, and that's why it's

17 important, because the University had no basis to even know

18 that that was an issue, let alone one that the law mandated

19 anything clear. And how was the University, therefore, supposed

20 to know how to act in a case like this 17 months earlier, when

21 it doesn't even know it's an issue, let alone any law on it.

22     I would submit to you, if you look at the briefs, there is

23 no law provided that touches on this issue, and it is a novel

24 issue. It's essentially asking for an automatic stay to be made

25 into a prohibitory -- I'm sorry -- into a mandatory injunction

1  versus a prohibitory injunction.

2      So without arguing the point, I don't need to, I don't

3  think, because University Medical Center would provide the

4  guidance, the law is not settled, therefore, it's not fair,

5  it's not due process for the University to be found to have

6  willfully violated something in that circumstance.

7      THE COURT: Thank you, Mr. Daar. Thank you for your spirited

8  and useful argument. Mr. Sabatini?

9      MR. SABATINI: Your Honor, if I could address one of those

10  last points first.

11      THE COURT: Sure.

12      MR. SABATINI: The issue before the Bankruptcy Court was not

13  simply whether the failure to insert a graduation date was the

14  violation of the stay.

15      On Page 12 of the brief, Coast again begins to frame the

16  issue in that way. They say;

17      "Aleckna misleadingly argues that the issue tried below was

18  whether a college needs to provide a transcript in order to

19  avoid violating the automatic stay, and that the law is settled

20  on that issue. But that was not the issue that was tried and

21  decided below by the Bankruptcy Court."

22      But that's not true. The Bankruptcy Court did try and

23  decide that very issue. Section B of Judge Opel's opinion

24  stretches from Pages 4 to 8 and deals with this exact issue,

25  the section is titled, "Is failure to issue a transcript a

1 violation of the automatic stay?"

2     And the holding in the last sentence of that section, he

3 concludes that a violation of the automatic stay has been

4 established. Then, later on, in Section D of his opinion, he

5 talks about the failure to include the graduation date. But for

6 four pages, he's analyzing the discrete issue of whether

7 Coast's initial failure to provide the transcript violated the

8 automatic stay.

9     Coast has, also, in its papers, framed our argument on that

10 point as being the delay -- the two-week period or whatever the

11 period was that it took them to deliver the transcript. But

12 that's not our argument.

13     If it took two or three weeks to just deliver the

14 transcript in the normal course -- if our client called up and

15 said, Hey, I filed a bankruptcy, could I get a transcript? And

16 they said, Sure, send in the 30 bucks for three transcripts,

17 and it takes three, four weeks and you'll have them, that would

18 be fine, if that's the normal process.

19     The problem is that they initially refused, and they

20 required her to involve legal counsel before they finally

21 decided to release the transcripts, which brings us to the

22 third point, which is the actual damages.

23     So they've said that, at the trial, there was no evidence

24 of attorney's fees. I appreciate the compliment about

25 experienced trial counsel or bankruptcy counsel, that I would

1   have introduced that type of evidence if I had that.

2       So if you look at Page 153 in the record, which is the

3   transcript for the trial, and it is the trial transcript Page

4   134. I'm not actually sure if that's page -- well, Page 134 of

5   the trial transcript, I believe it is.

6       On direct examination, I asked my client about the various

7   time entries that she paid me for dealing with this issue. I

8   said;

9       "QUESTION: So that sum is $126. Would you agree with that?

10      "ANSWER: Yes.

11      "QUESTION: So do you think that's a fair statement to say

12  that you incurred $126 in attorney's fees for my assistance

13  with helping you through responding to the phone call that you

14  had with Coast?

15      "ANSWER: Yes."

16      THE COURT: 126 hours?

17      MR. SABATINI: Dollars.

18      THE COURT: Dollars? Go ahead.

19      MR. SABATINI: So the time that I spent -- I didn't spend a

20  ton of time doing it -- the time I spent getting Coast to

21  provide the transcript, after they initially did not agree to

22  do it was $126 worth of time.

23      So those are what we described in our brief as defensive

24  attorney's fees. These are the fees that she incurred

25  protecting herself from the violation of the automatic stay,

1  and that's absolutely an actual damage.

2      So Judge Opel thought that, for purposes of economy, he

3  wanted me to put all of my attorney's fees in one issue -- in

4  one submission later. And in his opinion, he, on Page 13, says

5  the judgment will allow Aleckna 14 days from the judgment date

6  to file an itemized statement of attorney's fees and costs

7  incurred in seeking to obtain graduation transcripts and in

8  this adversary proceeding.

9      So he's recognizing two distinct types of attorney's fees.

10 One is the defensive attorney's fees, the $126 that she

11 incurred trying to get Coast to provide her with the

12 transcript, and the other is the traditional fee-shifting

13 attorney's fees that you see in fee applications all the time.

14     And that was not a coincidence. We devoted nearly two pages

15 in our post-trial brief explaining the difference between these

16 and the importance of the pre-litigation attorney's fees.

17     Another issue that we haven't talked about was, if

18 University Medical Center --

19     THE COURT: Before you move on. So with respect to the same

20 question I offered to Mr. Daar, under 362, you see your

21 attorney's fees as an element of damages, once the willfulness

22 of the violation of the automatic stay has been established?

23     MR. SABATINI: Which attorney's fees? The defensive

24 attorney's fees or the attorney's fees for litigating a trial?

25     THE COURT: The attorney's fees for litigating a trial.

1    MR. SABATINI: So, honestly, I don't know what 362 does with

2 this. 362 is written very unusually for a fee-shifting statute.

3 It's uncommon for a fee-shifting statute to say actual

4 damages--

5    THE COURT: Attorney's fees as damages, yes.

6    MR. SABATINI: So I honestly don't know the correct answer

7 to that. This was something that I was concerned with at the

8 trial, and we had a whole colloquy about when I would present

9 my evidence of attorney's fees, and it was decided that I would

10 introduce all of the attorney's fee information, both the

11 defensive fees, the $126, and all of the other part as a fee

12 submission later.

13    THE COURT: All right, I understand. Go ahead, I'm sorry I

14 interrupted you.

15    MR. SABATINI: So on University Medical Center, it's

16 important that -- the argument that they forfeited is important

17 because Coast -- it was Coast's burden to raise this argument,

18 to plead it as an affirmative defense.

19    In our brief, we spent six pages describing the Third

20 Circuit's decision in Evankavitch, where the Third Circuit has,

21 I think, five factors that they use to determine whether the

22 pleading standard and the burden will be put on the Plaintiff

23 or on the Defendant.

24    There was absolutely no response to any of our application

25 of all of those Evankavitch factors to the facts here, which

1   seems clear to me that this is an affirmative defense, that we

2   were not on notice.

3        So what would happen here, if you decided to remand this

4   for the Court to consider University Medical Center, we would

5   have to start all over and go through discovery again, because

6   we had no notice that University Medical Center is what they

7   wanted to argue.

8        They cite to Sterten in their brief. Sterten is a Truth in

9   Lending Act Tolerances case, and the Evankavitch Court actually

10  talked about Sterten for quite a bit, too, when they were

11  reaching their decision as to where to put the burden of proof

12  in that case.

13       And in Evankavitch, it was a Fair Debt Collection Practices

14  Act case, the debtor -- the consumer sued a debt collector who

15  called the consumer's neighbor. And the debt collector is only

16  allowed to contact a third party one time, unless the debt

17  collector has a reasonable belief that the information that the

18  debt collector previously obtained from the third party was

19  inaccurate or incomplete.

20       By that information, I'm referring to location information.

21  That's the only reason they can contact a third party, other

22  than an attorney or somebody. They can contact one time to

23  obtain location information, unless they have a reason to

24  believe that the earlier information that was provided was

25  erroneous or incomplete.

1    Well, they contacted the neighbors a number of times, so

2  the consumer sues. And in the trial, Judge Munley puts the

3  burden on the Defendant and says, you know, It's your burden to

4  prove that you had that type of reasonable belief.

5    So, on appeal, the Circuit upheld that decision, and they

6  looked through the factors and, again, they talked about

7  Sterten, a case that Coast cites to, and the Evankavitch Court

8  distinguished that case, they said;

9    "In concluding that there was no undue prejudice to the

10 Plaintiff consumer is a consequence of the Defendant's failure

11 to raise the Tolerances Provision as an affirmative defense. We

12 reason that the very same analysis that a consumer would

13 undertake to prove that a disclosure was inaccurate would also

14 reveal whether the inaccuracy fell within the Tolerances

15 Provision."

16    So the consumer has to go through and prove this whole case

17 up to show why the truth in lending disclosure is not accurate.

18 Well, that whole analysis, all of that, is also going to be the

19 information that they need to determine whether it was within

20 the Tolerances Provision, I'll start out with, all right.

21    The accuracy of the disclosure, they have to compute the

22 number, Well, is that within the Tolerances Provision? It's the

23 same information they need for both. That's not the case here.

24 We would have no reason to think that California Coast was

25 arguing that willful -- they were using the Judicial gloss of

University Medical Center willful -- but we would have no
reason to do that. And without that, we're just looking at
willful as, Did you know about the bankruptcy case? Yes,
Aleckna told you about it on the phone and you received a
letter in the mail, and you still didn't give her a transcript
with a graduation date.

So you knew about the bankruptcy case. Did you intend to do
the act? Yes, we intended to not send her a transcript for a
certain amount of time, and we intended to not have a
graduation date.

THE COURT: That's the standard in Atlantic, isn't it?

MR. SABATINI: That's the standard in Atlantic, that's the
standard in Lansdale -- Lansaw.

THE COURT: Atlantic is the predecessor of University
Medical Center, and I think its statement of what willfulness
is continues to be valid, but I'll be happy to be told that I'm
incorrect, if that's how you see it.

MR. SABATINI: If you have no other questions for me, I
think I'm finished.

THE COURT: Mr. Daar, you have the last word.

MR. DAAR: Thank you, Your Honor, I'll be very brief.

The issue really here should be simple, putting aside all
we have been arguing, because, if you look at the code and if
you look at the case law, it's very clear that there's a
two-step process to get to attorney's fees, and that first

requires you have to show that the violation of the automatic
stay was willful to the issue on appeal, to be willful, you
need to have a finding of actual injury being caused.

Here, there was no actual injury being caused, other than
Judge Opel's finding that Ms. Aleckna had to attend her own
trial. Once it's determined that there's injury, you get to a
violation that could be deemed willful, and if it's willful,
then, you get to the issue of damages, including attorney's
fees, which is why the absence of an actual injury, in any
compensable, normal world is missing here.

And without that, you don't get to a finding of willful,
period, irrespective of whether the law is settled or not,
irrespective of University Medical Center, it's that simple.

And then just to refer you to the record, Judge Opel did
not find that the attorney's fees you just heard about of $126
incurred pre- the transcript being provided as an element of
damages, and, therefore, that's not part of a finding of any
actual injury, because he didn't find it, probably, because the
law wouldn't allow him to. You need that actual injury, which
he found did not exist, other than attending one's own trial.
And that should be another alternative way of simply dealing
with this case.

You're dealing with a very novel situation, like I said.
Unfortunately -- or fortunately, I suppose -- Ms. Aleckna
wasn't the CEO of Apple or you'd be hearing that millions of

1 dollars were incurred by a day of the CEO of Apple attending

2 one's own trial to pursue a case individually or for Apple.

3 That's not common sense, that's not what should be deemed to be

4 an actual injury.

5     And without a finding of actual injury, which Judge Opel

6 did not make otherwise, you don't get to willful, and without

7 willful, there's no willful finding, we're done. So if you

8 reverse that part of the decision, the case is over.

9     With the issue of affirmative defense, because it didn't

10 come up earlier, it's in our reply brief with case citations of

11 Federal Rule 8(b) at Pages 10 and 11 of our reply brief, I

12 won't get into unless there's a question.

13     But I will close with, separate from University Medical

14 Center, there is no actual injury. Without an actual injury,

15 you don't get to those 362(k) attorney fee damages that the

16 Court was noting earlier. That's the disconnect. You need that

17 first actual injury to get to willfulness, and once there's a

18 finding of willfulness, then, you get a new level of damages.

19 That is why this appeal focuses on the issue of willfulness at

20 this point. Thank you, Your Honor.

21     THE COURT: I understand your argument and I thank you.

22 Thank you both.

23     I have nothing further. I think your submissions in writing

24 are complete. If there's something you want to add, I'll allow

25 you to do so, I don't know that it's necessary, however. But

1  you can tell me if there is something you want to submit

2  beyond -- I think we have had extensive oral argument here, and

3  I have your written submissions, I think I understand the

4  issues, but I'll offer the opportunity to submit something, but

5  it's not necessary.

6      MR. SABATINI: I would be happy to rest on what you have, if

7  that's satisfactory with the opposition.

8      MR. DAAR: In this case, the parties have briefed every

9  issue, and I thank you for all the time you gave us for oral

10  argument. I would think there's no need to submit anything

11  further.

12      THE COURT: All right, thank you both very much.

13      (At this time the proceedings were concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3          I, KRISTIN L. YEAGER, Official Court Reporter for the

4    United States District Court for the Middle District of

5    Pennsylvania, appointed pursuant to the provisions of

6    Title 28, United States Code, Section 753, do hereby certify

7    that the foregoing is a true and correct transcript of the

8    within-mentioned proceedings had in the above-mentioned and

9    numbered cause on the date or dates hereinbefore set forth; and

10   I do further certify that the foregoing transcript has

11   been prepared by me or under my supervision.

12

13                              S/Kristin L. Yeager
                                KRISTIN L. YEAGER, RMR,CRR
14                              Official Court Reporter

15
     REPORTED BY:
16
         KRISTIN L. YEAGER, RMR,CRR
17       Official Court Reporter
         United States District Court
18       Middle District of Pennsylvania
         P.O. Box 5
19       Scranton, Pennsylvania  18501

20

21

22          (The foregoing certificate of this transcript
     does not apply to any reproduction of the same by any means
23   unless under the direct control and/or supervision of the
     certifying reporter.)

24

25